UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

_____
                                   )
GLACIER WATER COMPANY, LLC, *et al.*,  )      No. C08-1705RSL
                                   )
                Plaintiffs,        )
                                   )      MEMORANDUM OF DECISION
        v.                         )
                                   )
ROBERT EARL, *et al.*,             )
                                   )
                Defendants.        )
_____)

This matter was heard by the Court in a bench trial commencing on November 15, 2010, and concluding on November 22, 2010. Plaintiffs accuse defendants of utilizing plaintiffs' confidential business information to file water rights applications and unfairly taking unilateral control over the resulting applications – in effect, defendants are accused of "claim jumping." Plaintiffs seek the return or cancellation of the pending applications under various theories, each of which is discussed below.

**FINDINGS OF FACT**

Plaintiff Glacier Water Company, LLC, is a limited liability company that controls two water rights certificates on the Carbon River, one for thirty-two acre-feet of water and the other for eight acre-feet of water. Glacier Water Company has bottled water from the Carbon River sporadically over the past twenty years. In 2004, John Destito, Sungwook Choe, and several others formed plaintiff Glacial Nova LLC to invest in Glacier Water Company. Seeking

MEMORANDUM OF DECISION

to grow Glacier Water's share of the premium bottled water market, Destito and Choe developed plans to build a new warehouse and expanded bottling facility, entered into a deal with Sylvester Stallone for a branded product, and engaged a water consultant and a facilities design firm to further their expansion plans. The long-term goal was to have a bottling facility designed specifically for glacial water which could produce far more than the existing water certificates could support. Defendant Earl had no contemporaneous knowledge of, and made no contribution to, any of these activities.

In early 2006, one of Earl's business partners suggested that Earl meet with Destito to learn more about the bottled water business. Although Earl knew virtually nothing about the industry, glacial water, or the Carbon River when the parties first met, he liked the idea of bottled water as a business venture and easily convinced Destito that Glacier Water would achieve its development goals much faster with Earl as a partner. Earl also liked Destito and appreciated his passion for the business. Earl understood, however, that he could not simply follow where Destito led. In fact, Earl did not trust Destito's rather hyperbolic claims regarding Glacier Water's business prospects: he realized that he would have to pour through the company's records to determine the real state of Glacier Water's affairs. Nor did Earl believe that a business model based on high-end water products would be particularly successful. Instead, Earl pushed plaintiffs to expand the water rights certificates to the greatest extent possible so that the parties could exploit the low-end bottled water market. In order to determine whether a joint venture between the parties was feasible, Earl and his representatives agreed in principle that Glacier Water's confidential business information should be protected and obtained access to the company's information and documents.

The first stage of Earl's "due diligence" lasted almost a year and included the retention of a water rights attorney, Sarah Mack, to review the validity of Glacier Water's existing certificates and to assist in the preparation of an application for additional water rights. Earl had every opportunity and motive to conduct a thorough investigation of Glacier Water, its

business prospects, and its principals. In February 2007, the parties entered into two contracts, the Operating Agreement of Mountain Water, LLC, and an Asset Purchase and Assignment Agreement.[1] Earl, through an entity called Glacial Investors, LLC,[2] contributed $100.00 to the new venture in exchange for a 51% interest in Mountain Water. Glacier Water agreed to convey water assets pursuant to the Asset Purchase Agreement in exchange for the other 49% of Mountain Water. If the Asset Purchase Agreement were terminated before the water certificates were transferred to Mountain Water, Glacier Water's 49% interest in Mountain Water would be "canceled and terminated at such time, effective as if such Company Interest had never been issued." Trial Ex. 45 at GWGN002448.

In the Asset Purchase and Assignment Agreement, Glacier Water promised to convey all of its assets, including the existing water rights certificates and its trade secrets and confidential business information, to Mountain Water, LLC, at closing. As consideration, Glacier Water was to receive a 49% interest in Mountain Water[3] and up to $500,000 to discharge Glacier Water's accounts payable. For purposes of this agreement, the parties defined "trade secrets and confidential business information" to include "ideas, research and development, know-how, compositions, techniques, technical data, designs, specifications, customer and supplier lists (including all contact information), pricing and cost information, and business and

---

[1] Although the copy of the Operating Agreement admitted at trial is unsigned, Earl's representative called it a "final agreement" when it was transmitted to plaintiffs. Trial Ex. 45. In addition, the Operating Agreement was a prerequisite to the Asset Purchase and Assignment Agreement in that it brought Mountain Water LLC into existence so that it could contract to purchase the assets of Glacier Water. Even if there were some doubt about whether the parties actually signed the Operating Agreement, the agreement would nevertheless be enforceable: the parties achieved a meeting of the minds and, as discussed below, they conducted themselves as if Mountain Water had come into existence on the terms specified in the Operating Agreement.

[2] Earl owned 100% of H2Earl, LLC, which owned 100% of Glacial Investors, LLC.

[3] This provision of the Asset Purchase and Assignment Agreement is arguably inconsistent with the Operating Agreement, which gave Glacier Water a 49% interest in Mountain Water at the time of contracting.

MEMORANDUM OF DECISION                 -3-

marketing plans and proposals." Trial Ex. 45 at GWGN002481.

From February 2007 to April 2007, the parties acted as if they were partners in a joint venture, with Earl being the dominant partner. As they moved forward with their expansion plans, Earl and his people were involved in Glacier Water's marketing, operations, and contracting. By the end of February, Earl had informed Sarah Mack, the water rights attorney, that he now controlled a majority of Glacier Water and instructed her to put together a water rights application capable of producing 250 million cases of bottled water. Glacier Water cooperated with Mack, providing expertise and information for a new 2000 acre-feet water rights application and a "back up" for the existing thirty-two acre-feet certificate.

Initially, both Earl and Glacier Water intended that the water rights applications would be assets of Mountain Water, LLC. Glacier Water was apparently willing to let Earl submit the applications in the name of Mountain Water, rather than in its own name, because Glacier Water held a 49% interest in the joint venture. Shortly before the new water rights applications were filed, however, Earl created a new entity, defendant Aqua Holdco, LLC,[4] and instructed Mack to file the applications in its name. It is not clear when Glacier Water learned of this change, but it was given various explanations and assured that the applications were for the benefit of the joint venture. Earl's unilateral decision to utilize Aqua Holdco rather than Mountain Water as the applicant meant the applications were now completely in Earl's control.

Glacier Water continued to provide information regarding the water rights application process, operating budgets, and marketing opportunities over the next eight weeks. On June 7, 2007, Earl notified Destito that he was pulling out of the Mountain Water project because he was not comfortable moving forward when Glacier Water had so many unresolved financial and legal liabilities. Earl offered to turn the water rights applications over to Glacier Water. Destito, however, left the meeting with the belief that if Glacier Water could pay off

---

[4] Glacial Investors, LLC, the nominal majority member in Mountain Water, LLC, owned 100% of Aqua Holdco, LLC.

MEMORANDUM OF DECISION                -4-

some of its accounts payable and settle a pending lawsuit with A&W Bottling Co., Earl might be enticed back into the joint venture. Glacier Water therefore continued to send Earl updates and information regarding its efforts to resolve outstanding liabilities and its development activities. On July 31, 2007, Earl's attorney sent Glacier Water an official-looking letter demanding information regarding Glacier Water's compliance with various provisions of the Asset Purchase and Assignment Agreement. Destito responded with the "brothers of light" letter in which he pointed out that Earl had backed out of the Mountain Water project almost two months before, asserted that the parties no longer had any obligations as joint venturers, and requested that Aqua Holdco cancel the two pending water rights obligations. In a curt memorandum dated August 14, 2007, Earl wished Destito luck in the water business, but made it clear that the parties' relationship was at an end.[5] Earl declined to cancel or transfer the water rights applications. Mountain Water, LLC, was dissolved on September 26, 2008.

---

[5] The text of Earl's memorandum (Trial Ex. 126) is as follows:

> I reviewed your recent note of August 8 and it is 100% inaccurate. You have failed to answer any of our inquiries. You have continuously failed to apprise me of your business activities as required under the pending agreement and you have failed to obtain my approval prior to entering into leases, agreements and/or transactions, etc., that were not in the normal course of business per the agreement. Additionally, based upon your letter it is apparent that you have assumed new and material liabilities for Glacia Nova and/or Glacier Water Company.
>
> The agreement was delivered to our escrow agent and was being held in escrow pending approval of this transaction by the Compliance Committee. Based upon your non-compliance and the results of our background investigation this transaction cannot be approved and the escrow agent has been advised that the conditions for release of the documents cannot be met.
>
> Based upon the above and your understanding that the agreement has never been fully executed and/or that it was rescinded we are both clear that the agreement is not in effect.
>
> I do not see any reason for our meeting on Thursday and I wish you the best of luck in your water business.

MEMORANDUM OF DECISION                -5-

## CONCLUSIONS OF LAW

**A. BREACH OF CONTRACT**

Based on the foregoing facts, the Court concludes that both the Operating Agreement of Mountain Water, LLC, and the Asset Purchase and Assignment Agreement are enforceable contracts. The Court further concludes that defendant Earl completely dominated the various LLCs' existences and improperly utilized their separate legal forms to obtain unilateral control over what was supposed to be a joint asset.

    1. Ownership of Confidential Business Information

Plaintiffs argue that Earl breached the Asset Purchase and Assignment Agreement by retaining plaintiffs' confidential information after the proposed transaction failed to close. Although it is clear that ownership of plaintiffs' trade secrets and confidential business information was never transferred to defendants, plaintiffs shared the information during due diligence and acquiesced in its use for purposes of filing the new water rights applications. Because plaintiffs have not identified any provision of the Asset Purchase and Assignment Agreement that required defendants to disgorge information obtained during due diligence, they have not shown a corresponding breach.

    2. Duty to Restore Parties

Plaintiffs do not contend that Earl breached the Asset Purchase and Assignment Agreement by walking away from the deal. Rather, plaintiffs maintain that, having exercised his right of rescission, Section 9.6 of the Agreement obligated Earl to restore the parties to the relative positions they would have occupied had they never entered into the Agreement. Section 9.6 does not explicitly impose a duty on any party to the agreement. Read in its entirety, the alleged "promise" of restoration is simply an expected by-product of rescission: neither plaintiffs nor Earl is tasked with ensuring that restoration is achieved. Nor does Section 9.6 make provision for the possibility that, as occurred here, a new asset might come into existence. Prior to contracting, neither party owned or controlled the water rights applications at issue in

this litigation, and the Court cannot find that either party would have filed the applications in April 2007 had the joint venture not existed. The contract is silent on how newly-created assets should be weighed in the restoration process, and the Court will not infer a duty or presume a breach in this context.

### 3. Non-Disclosure Agreement

Plaintiffs also argue that Earl breached his promise to keep confidential any trade secrets or confidential information provided by plaintiffs during due diligence. Plaintiffs have not, however, shown that Earl disclosed such information in an unauthorized manner to any third party. The disclosures made in aid of the water rights applications were authorized. Nor have plaintiffs identified an enforceable obligation to return confidential information obtained during due diligence once it became clear that the joint venture had failed. Plaintiffs have not, therefore, established a breach of the non-disclosure agreement.

### 4. Oral Promise to Return Applications

The Court concludes that there was no meeting of the minds with respect to Earl's June 7, 2007, offer to return the water rights applications to Glacier Water. At the time, Destito did not accept the offer because he still hoped to salvage the relationship. In the "brothers of light" letter, Destito made a counteroffer which involved withdrawal of the applications rather than transfer. Earl rejected the counteroffer. No agreement was reached on this issue.

## B. PROMISSORY ESTOPPEL

Plaintiffs have established that: (1) a promise was made which (2) defendants should reasonably have expected would cause plaintiffs to change their position and (3) which did in fact cause plaintiffs to change their position (4) in justifiable reliance on the promise and (5) in such a manner that injustice can be avoided only by enforcing the promise. King v. Riveland, 125 Wn.2d 500, 506 (1994). Earl promised, through oral representations, the written contracts, and his course of conduct, that the water rights applications the parties were preparing in the spring of 2007 would be filed for the benefit of the joint venture. Plaintiffs therefore

MEMORANDUM OF DECISION                -7-

shared confidential business information and trade secrets with defendants, assisted them in filing the water rights applications, and did not oppose the applications when filed. Given the nature of the relationship between the parties at the time, plaintiffs' reliance was reasonable. Defendants, however, took steps that would ultimately enable them to cut plaintiffs out of the Mountain Water project without any legal claim to the applications. By filing the applications in the name of Aqua Holdco, an entity wholly owned by Earl, defendants deprived plaintiffs of any control over those applications and made inapplicable the allocation and distribution provisions of Mountain Water's Operating Agreement. Defendants did not live up to their promise to file the water rights applications for the benefit of the joint venture and ultimately took advantage of the corporate structures they had created to ensure that plaintiffs had no contractual interest in the applications. In these circumstances, it would be inequitable to allow defendants to retain unilateral control of the applications.[6] Defendants' promise can best be enforced by directing Earl and Aqua Holdco to cancel or otherwise withdraw the water rights applications filed in April 2007.

## C. UNJUST ENRICHMENT

Unjust enrichment permits a party to recover the value of a benefit conferred to and retained by another party in the absence of a contractual relationship. Young v. Young, 164 Wn.2d 477, 484 (2008). Because the parties' relationship was governed by contract, plaintiffs may not recover under a theory of unjust enrichment.

---

[6] Any omissions or misrepresentations made by plaintiffs during due diligence do not change the equitable balance for purposes of this claim. Defendants had contractually protected themselves from the possibility that Destito was overstating Glacier Water's business prospects: they had months in which to investigate plaintiffs' claims, negotiated expansive investigative powers, had access to all requested information and documents, had a contractual right to terminate the relationship for any reason, and could pursue reimbursement of all expenses incurred in negotiating and preparing for the asset purchase and assignment. Having chosen not to pursue their contractual remedies, defendants cannot simply abscond with the water rights as some sort of "payment" for the time and energy it took to determine that plaintiffs were not viable business partners.

MEMORANDUM OF DECISION                -8-

### D. MISAPPROPRIATION OF TRADE SECRETS

Plaintiffs have failed to establish that defendants misappropriated plaintiffs' trade secrets. Pursuant to RCW 19.108.010(2), "misappropriation" means the acquisition of a trade secret by improper means and/or the unauthorized disclosure of a trade secret. As discussed above, plaintiffs voluntarily disclosed the technical information, business opportunity plans, and know-how at issue in this claim for the purposes of applying for expanded water rights. The acquisition of the information and its disclosure in aid of the water rights applications were authorized. Plaintiffs' trade secret claim fails as a matter of law.

### E. INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS

Plaintiffs argue that defendants interfered with their relationships with Mountain Water LLC and the water rights attorney who prepared the April 2007 applications for improper purposes or using improper means. Because the remedy for intentional interference is the same as the remedy sought and obtained on the promissory estoppel claim, the Court need not resolve this claim.

### F. DEFENDANTS' CONSUMER PROTECTION ACT CLAIM

Defendants argue that plaintiffs committed unfair and deceptive acts when they failed to disclose information material to a proposal to sell securities, namely the existence of Destito's prior securities violations and consent orders. Defendants have failed to establish that the public has an interest in the specific conduct at issue, however. The parties' private negotiations and business relationship do not affect the public interest for purposes of the Washington Consumer Protection Act. Although the alleged conduct occurred in the course of plaintiffs' business, the relationship of the parties did not arise out of the advertising or sale of products or an active solicitation of business. Nor does the fact that Destito has engaged in arguably similar conduct on one or two occasions in the past satisfy the public interest element: each misstatement or omission arose in unique circumstances and, even when considered together, do not give rise to a plausible inference that the public is at risk of enduring similar

conduct or suffering harm.[7] Plaintiffs' "Motion for Judgment as a Matter of Law on Defendants' Consumer Protection Counterclaim" (Dkt. # 116), is granted.

**G. ATTORNEY'S FEES**

Paragraph 12.12 of the Asset Purchase and Assignment Agreement provides:

> In the event any arbitration, litigation or controversy arises out of or in connection with this Agreement between the parties thereto, to the extent not in conflict with the provisions of Section 12.11 hereof, the prevailing party in such arbitration, litigation or controversy shall be entitled to recover from the other party or parties all reasonable attorneys' and paralegals' fees, expenses and suit costs, including those associated with any appellate or post-judgment collection proceedings.

Although defendant Earl is not a party to the Agreement, the Court has already found that he is the alter ego of Mountain Water: he may, therefore, seek fees under this provision. Defendant Aqua Holdco, however, is not a party to the Agreement (or the alter ego of a party) and is not entitled to an award of fees.

Under Florida law, contractual attorney's fee provisions are enforceable. Lashkajani v. Lashkajani, 911 So.2d 1154, 1158 (Fla. 2005). The issue in this case is who is the prevailing party when plaintiffs obtained all of the relief requested at trial but does not prevail on the express contract claim? Where plaintiffs have asserted a multi-count complaint and obtained relief on a non-contract claim, there is authority for allocating attorney's fees among the various claims and awarding to defendants only the portion that is related to the successful defense of the contract claim. See Lochrane Eng'g, Inc. v. Willingham Realgrowth Inv. Fund, Ltd., 563 So.2d 719, 720-21 (Fla. App. 1990). In this case, however, the Court finds that language of the attorney's fee provision requires a different resolution. The attorney's fee provision applies not only to plaintiffs' breach of contract claim, but also to their promissory estoppel claim. Both causes of action arose out of or in connection with the Asset Purchase and Assignment

---

[7] Defendants have not shown that Destito's purported offer of unregistered securities at the very beginning of the parties relationship caused injury cognizable under the Consumer Protection Act.

MEMORANDUM OF DECISION                    -10-

Agreement: the written contracts formed part of the promises upon which plaintiffs justifiably relied when they assisted defendants' in filing the April 2007 water rights applications. Plaintiffs prevailed on their promissory estoppel claim, while Earl successfully defended the express contract claim, leading to the conclusion that, as far as the claims arising out of the written contract go, neither party is "the prevailing party in such . . . litigation or controversy." The parties' competing requests for an award of fees under ¶ 12.12 of the Asset Purchase and Assignment Agreement are therefore denied.

For all of the foregoing reasons, defendants shall, within thirty days of the date of this Decision, take all necessary and appropriate steps to cancel, rescind, withdraw, or otherwise permanently terminate the two water rights applications filed on behalf of Aqua Holdco, LLC, with a priority date of April 16, 2007. The Clerk of Court is directed to enter judgment in favor of plaintiffs and against defendants.

Dated this 7th day of December, 2010.

*Robert S. Lasnik*
Robert S. Lasnik
United States District Judge

MEMORANDUM OF DECISION                -11-